UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

    JOHN GORMAN,

                        Plaintiff,

                  v.

    COVIDIEN, LLC, d/b/a COVIDIEN, *et al.*,

                     Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 19, 2015

13 Civ. 6486 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      John Gorman brings claims for discrimination and retaliation under both the New York State and New York City Human Rights Laws, as well as a claim for intentional infliction of emotional distress, naming as Defendants his former employer, Covidien Sales, LLC ("Covidien"), and his former supervisor, Dale Kelly. Defendants have moved for summary judgment on all claims. For the reasons set forth in this Opinion, the Court grants Defendants' motion in part and denies it in part.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   Gorman's Employment History at Covidien

Gorman spent over a decade working for Covidien, the sales branch of medical device and supplies manufacturer Covidien LP.  (Def. 56.1 ¶¶ 1, 5).  He was first hired as an Imaging Account Manager in August 2001, and, after his position was eliminated in November 2009 as part of a corporate restructuring, was re-hired as an Account Representative in May 2010.  (*Id.* at ¶¶ 7, 9).  Prior to the restructuring, Gorman had been formally disciplined, via a "Final Written Warning" from a Covidien Zone Vice President, for purportedly making inappropriate comments to several female co-workers.  (*Id.* at ¶ 6).[2]  Despite

---

[1]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #29-2)), and Plaintiff's responses thereto ("Pl. 56.1" (Dkt. #34-2)).  References to individual deposition transcripts and declarations will be referred to as "[Name] Dep." and "[Name] Decl.," respectively.  For convenience, Defendants' opening brief will be referred to as "Def. Br." (Dkt. #29); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #34); and Defendants' reply brief as "Def. Reply" (Dkt. #38).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2]    Covidien has several means of addressing employee performance or behavior that fails to meet company policies and expectations, including written warnings, "Coaching Plans," and "Performance Improvement Plans."  (Aranyos Decl. Ex. L at 17, 36-37; Mullen Dep. 66).  While written warnings are typically given progressively, with a fourth warning being the final one, Covidien's employment policy explains that in instances of more egregious behavior, one or more of the intermediate warnings may be bypassed.  (Aranyos Decl. Ex. L at 37).

this receipt, Gorman both kept his then-current position, and was later able to re-join Covidien after that position had been eliminated.

### 2. Gorman's Completion of the Coaching Plan

Gorman's responsibilities as an Account Representative included meeting sales quotas, developing clinical relationships, managing expenses, forecasting sales, and presenting himself to clients in a professional manner.  (Def. 56.1 ¶ 23).  Though Gorman met his sales quotas, he received a Coaching Plan approved by his supervisor, Sean Stewart, and by Sales Vice President George Mullen, in May 2011 to address behavioral and performance-related deficiencies reportedly observed by Stewart.  (*Id.* at ¶¶ 24, 25, 27-30; Pl. 56.1 ¶¶ 24, 25, 27-30 (acknowledging the imposition of the plan, but denying the conduct for which the plan was imposed)).  Gorman successfully completed the Coaching Plan, which required him to submit business outlines and weekly time logs, and continued as an Account Representative until Covidien promoted him to Account Executive II in December 2012.  (Def. 56.1 ¶¶ 31, 33, 37).

---

Where an employee's shortcomings include both behavioral and performance-related components, Covidien may implement either a Coaching Plan or a Performance Improvement Plan to help bring the employee up to Covidien's standards.  (*Id.* at 17; Mullen Dep. 55, 66).  According to Covidien's employment manual, these tools are "designed to clarify the standards of the job, explain how [an employee's] performance fails to meet those standards and identify specific improvements that [he or she] must make in order to meet those standards."  (Aranyos Decl. Ex. L at 17).  While Coaching Plans and Performance Improvement Plans accomplish similar goals, a Performance Improvement Plan is more formal.  (Mullen Dep. 66).  An employee who fails to complete either form of plan successfully may be terminated, and employees typically will not receive more than one opportunity to go on a Performance Improvement Plan during their employment.  (Aranyos Decl. Ex. L at 17).

In April 2013, Covidien restructured its sales organization, eliminating some positions and dividing the remaining sales representatives into two categories:  Territory Managers and Account Executives.  (Def. 56.1 ¶ 38).  As a result of this shift, on April 8, 2013, Gorman became a Territory Manager.  (*Id.* at ¶ 40).  Gorman reported to Dale Kelly, who had replaced Sean Stewart as Gorman's supervisor in October 2012.  (*Id.* at ¶¶ 35, 40).

The duties of a Territory Manager largely tracked those of Gorman's previous position:  Gorman had "primary responsibility for the customer relationships to understand and target customer consumable product needs; [and] develop and execute a sales strategy around those opportunities."  (Def. 56.1 ¶ 41).  Gorman was also expected to "collaborat[e] with Region Managers (RSMs), Capital Account Executive[s], and Care Area Specialists to gather pertinent information, provide incomparable service, reach or exceed target consumable sale goals," and develop and execute sales strategies.  (*Id.*).  Gorman's mid-year review from the 2013 fiscal year reflects generally strong performance, though it notes that he finished the first half of the year at only 8.4% of his hardware quota.  (*Id.* at ¶ 43).

### 3.    Gorman's Difficulties as a Territory Manager

In May 2013, conflict between Gorman and officials at Stony Brook University Hospital ("Stony Brook"), one of Gorman's accounts, culminated in Stony Brook requesting that Gorman be removed from its account.  (Gorman Dep. 154-55).  Specifically, Stony Brook Materials Manager John Moscarelli complained to Kelly that Gorman had violated hospital policy by going directly

4

to clinicians rather than first taking sales promotions to Moscarelli.  (*Id.* at 150-55).  Although Covidien informed Gorman that he was no longer allowed at Stony Brook's facility, Gorman continued to receive commissions on sales made to that account.  (*Id.* at 267).

Kelly also received complaints about Gorman from individuals within Covidien, including Care Area Specialist Megan Desmond and Vice President of Marketing Kendall Qualls.  (Def. 56.1 ¶¶ 57, 66).  As a Care Area Specialist, Desmond's responsibilities included educating customers about the clinical uses of Covidien's products and working with Gorman by participating in joint calls, facilitating sales, and assisting with clinical trials.  (*Id.* at ¶¶ 53-54).  In May 2013, Desmond and Gorman attended a meeting with a group of clinicians for which Desmond felt she was wholly unprepared.  (*Id.* at ¶ 57).  After the meeting, Desmond sent an email to Kelly complaining that (i) Gorman had failed to communicate with her about the meeting; (ii) she only learned about the meeting when she received an email from the customer; and (iii) she had prepared for a meeting with two clinicians, but was then confronted with a 20-person roundtable discussion.  (Aranyos Decl. Ex. V).  Following Desmond's complaint, Kelly sent Gorman an email listing "Areas of Concern," in which Kelly referenced the grievances from both Stony Brook and Desmond, and advised Gorman that he needed to improve in a number of performance and behavioral arenas.  (Def. 56.1 ¶¶ 59-61; *see also* Pl. 56.1 ¶¶ 59-61 (acknowledging the email, but disputing the legitimacy of the complaints upon which it was based)).

5

Shortly after Kelly sent his "Areas of Concern" email, Kendall Qualls went on a "ride along" with Gorman to visit field sites.  (Def. 56.1 ¶ 64).  Thereafter, Qualls emailed both Kelly and Mullen to suggest that Gorman did not maximize their time on the visits and that he (Gorman) lacked strong relationships with his clinical customers.  (*Id.* at ¶¶ 65-66).  Qualls specifically reported that the doctor at their first appointment was not expecting Gorman; that Gorman appeared to lack any relationship or familiarity with the second hospital they visited, at which several pieces of Covidien equipment were in disrepair or needed replacing; and that Gorman seemed to lack relationships with clinicians and struggled to articulate Covidien's technology vis-à-vis that of its competitors at a third hospital.  (*Id.* at ¶ 66).  Gorman does not allege that either Desmond or Qualls had any discriminatory bias against either veterans or disabled individuals, and Qualls is himself a veteran.  (*Id.* at ¶¶ 57, 67).

### 4.    The Implementation of the PIP

Following Qualls's "ride-along" email, Kelly discussed Gorman's performance and behavior with Mullen and two representatives from Covidien's Human Resources Department, Brian Fink and Lisa Roe.  (Def. 56.1 ¶ 68).  At Kelly's suggestion, the group approved Gorman's placement on a Performance Improvement Plan (the "PIP").  (Mullen Dep. 37; Def. 56.1 ¶ 69).

The PIP went into effect on June 7, 2013, and was to last for 90 days.  (Def. 56.1 ¶¶ 72-73).  While it contained both sales performance and behavioral components, the PIP's primary focus was on professional behavior:  Three of the four "performance objectives" dealt with professionalism and interpersonal

6

relationships, under the headings "Developing Key Clinical Relationships,"
"Communication," and "Professional Behavior." (Aranyos Decl. Ex. BB). In
addition to providing high-level goals, the PIP detailed "Action Plans" for how
Gorman would spend and account for his time, including requirements that he
(i) provide forecasts and summaries of his meetings with clinical contacts;
(ii) engage in a set number of meetings with "Key Decision [M]akers" at
customer hospitals, spending at least three days of the week focusing on
contacts in operating rooms, anesthesia, or surgery; (iii) meet set quotas for
new sales opportunities and update his records accordingly; (iv) participate in
weekly calls with his Care Area Specialist and Capital Account Executive; and
(v) review and abide by Covidien's Travel and Expense Policy, as well as all
customer hospital policies. (*Id.*; Def. 56.1 ¶¶ 74-77).

## 5. Gorman's Allegations of Discrimination and Covidien's Response

On June 11, 2013, four days after the PIP's implementation, Gorman
filed an internal discrimination complaint with Covidien's Ombudsman and
reporting hotline. (Def. 56.1 ¶ 78). He alleged that Kelly had made disparaging
comments about veterans at a lunch meeting with Gorman one month earlier,
on May 13, 2013, and that Kelly had made further hostile comments
specifically targeting Gorman's status as a disabled veteran when he presented
Gorman with the PIP on June 7, 2013. (*Id.*). Gorman additionally noted that
during the June 7 encounter, Kelly "reeked of alcohol" and aggressively
demanded that Gorman sign the PIP, which Gorman refused to do. (*Id.* at
¶ 85).

On the day after he made his complaint, June 12, 2013, Gorman contacted Lisa Roe and Brian Fink in Human Resources to report that he believed Kelly was stalking him. (Def. 56.1 ¶ 82). Gorman came to this conclusion based on the fact that Kelly had "checked in" on social media at a bar in Gorman's neighborhood. (*Id.*). Gorman also noted that, based on his review of Kelly's social media posts, he believed Kelly to have consumed alcohol during work hours. (*Id.*).

Roe initiated an investigation into Gorman's complaints on June 12, 2013 (Def. 56.1 ¶ 83), interviewing Gorman, Kelly, Mullen, Stewart, and an additional Covidien employee about the allegations (*id.* at ¶ 86). Roe ultimately concluded that none of Gorman's complaints about Kelly could be substantiated, and communicated this finding to Gorman on July 18, 2013. (*Id.* at ¶ 87). Nevertheless, after Gorman filed his complaint, Mullen took over managing Gorman's PIP and Kelly was removed from their weekly phone conferences. (*Id.* at ¶ 93).

As acting supervisor of Gorman's PIP, Mullen counseled Gorman on various performance issues in July and August 2013, summarizing many of them in an email to Gorman on August 1, 2013. (Def. 56.1 ¶ 94). Specifically, Mullen noted "definite concerns around [Gorman's] behaviors and ability to be successful in the Territory Manager role," including Gorman's incorrect forecasting of his sales opportunities, his poor use of time in the field, and the lack of clarity and detail in his communications. (*Id.*). Mullen concluded by noting that "[b]ased on [Gorman's] tenure," he looked to Gorman "to serve as a

leader and strong resource on the [New York] team," and that he was "fully available to support [Gorman's] efforts."  (*Id.*).

Gorman began searching for other employment on the day that he received the PIP.  (Def. 56.1 ¶ 102).  He went on medical leave from June 13 to June 28, 2013, during which time he continued applying for positions outside of Covidien.  (*Id.*).  On June 13, 2013, he visited a physician to seek treatment and medication for work-related anxiety.  (*Id.* at 100; Gorman Dep. 368-69).  Gorman subsequently saw a psychologist, who diagnosed him with post-traumatic stress disorder.  (Def. 56.1 ¶ 101).

The PIP was suspended during Gorman's leave, but resumed once Gorman returned to work, with the term extended to account for the period of its suspension.  (Gorman Dep. 253, 313; *see also* Aranyos Decl. Ex. BB (noting that the PIP will be extended to account for any leaves of absence taken during its term)).  Shortly after Gorman's return, a $240,000 credit was levied against his sales commissions.  (Pl. 56.1 ¶ 40; Gorman Dep. 314).  This levy came about because a customer, North Shore Warehouse, had accrued "award credits" for using Covidien as a supplier.  (Gorman Dep. 314).  These credits allowed North Shore to apply a certain percentage of the net value of its past business with Covidien to its future purchases, a system that North Shore chose to take advantage of by "cashing in" its amassed credits in August 2013.  (*Id.* at 314-16).  This translated to a levy on sales commissions that affected Gorman, Kelly, and Mullen, though not in equal measure.  (*Id.* at 317).

On September 6, 2013, prior to the PIP's expiration, Gorman resigned from his position with Covidien and accepted a job with a different medical device company.  (Def. 56.1 ¶ 103).

## B.   Procedural Background

On August 9, 2013, while still working for Covidien, Gorman filed a complaint against Dale Kelly and Covidien in New York State Supreme Court alleging violations of the New York State Executive Law §§ 296 to 301, commonly known as the New York State Human Rights Law (the "NYSHRL"); violations of the New York City Administrative Code, §§ 8-101 to 8-131, commonly known as the New York City Human Rights Law (the "NYCHRL"); and intentional infliction of emotional distress.  (Dkt. #1).  Defendants filed for removal to federal court on September 13, 2013, on the basis of diversity jurisdiction.  (*Id.*).

After filing an initial answer on September 19, 2013, Covidien moved to file an amended answer on April 21, 2014, seeking to add an affirmative defense based on after-acquired evidence.  (Dkt. #9).  Gorman filed his opposition to Covidien's motion for leave to amend on June 20, 2014 (Dkt. #19), and Covidien filed its reply on June 26, 2014 (Dkt. #20).  On December 31, 2014, the Court granted Covidien's motion (Dkt. #23), and Covidien's amended answer was subsequently filed on January 5, 2015 (Dkt. #25).

Defendants filed the instant motion for summary judgment on April 6, 2015. (Dkt. #28). Gorman filed his opposition on May 7, 2015 (Dkt. #34), and Defendants filed their reply on May 20, 2015 (Dkt. #38).

## DISCUSSION

### A.    Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in

his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted).

Finally, "[w]hen ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

**B.      Summary Judgment Is Granted as to Gorman's Discrimination
         Claims Under the NYSHRL**

      **1.      Applicable Law**

            **a.      The Scope of Liability Under the NYSHRL**

Gorman brings two separate claims for discrimination under the

NYSHRL against Covidien and Kelly; the first concerns his status as a veteran,

and the second concerns his actual or perceived disability of PTSD.  Among

other things, the NYSHRL makes it an "unlawful discriminatory practice" for

"an employer or licensing agency, because of an individual's . . . military status

[or] disability . . . to refuse to hire or employ or to bar or to discharge from

employment such individual or to discriminate against such individual in

compensation or in terms, conditions or privileges of employment."  N.Y. Exec.

Law § 296(1)(a).

The NYSHRL is often considered analytically identical to its federal

counterpart, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to

2000e-17.  One way in which the NYSHRL differs from Title VII, however, is

that the state statute has a stricter standard for imputing liability to an

employer.  *See, e.g.*, *Int'l Healthcare Exch., Inc.* v. *Global Healthcare Exch., LLC*,

470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (collecting cases).  Specifically,

liability for an employee's discriminatory conduct may only be imputed to an

employer under the NYSHRL if the employer "became a party to it by

encouraging, condoning, or approving it."  *Brown* v. *City of New York*, No. 11

Civ. 2915 (PAE), 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013) (internal

quotation marks omitted); *see also Doe* v. *State of New York*, 933 N.Y.S.2d 688,

690 (2d Dep't 2011) ("'Under [Section 296], [a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.' It is only after an employer knows or should have known of improper discriminatory conduct that it can 'undertake or fail to undertake action which may be construed as condoning the improper conduct.'" (citations omitted)); *Forrest* v. *Jewish Guild for the Blind*, 3 N.Y.3d 295, 311 (2004) ("'[A]n 'employer cannot be held liable under state law for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'" (quoting *Matter of State Div. of Human Rights* v. *St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985))).[3]

---

[3]     Covidien argues that, even assuming Gorman was subject to discrimination, it is insulated from liability under what is commonly referred to as the "*Faragher/Ellerth* defense." (Def. Br. 18-19). *See generally Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998); *Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998). That defense, developed in the Title VII setting, provides that if a plaintiff's

> Supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that [i] the employer exercised reasonable care to prevent and correct any harassing behavior and [ii] that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance* v. *Bell State University*, — U.S. —, —, 133 S. Ct. 2434, 2439 (2013). "A tangible employment action ... constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

Preliminarily, it is unclear that the *Faragher/Ellerth* defense applies to claims brought under the NYSHRL. *See Setelius* v. *Nat. Grid. Elec. Serv.*, No. 11 Civ. 5528 (MKB), 2014 WL 4773975, at 29 n.25 (E.D.N.Y. Sept. 24, 2014) (reviewing state and federal cases addressing this proposition). However, because the Court concludes that Gorman has failed to demonstrate an issue of fact sufficient to forestall summary judgment as to his discrimination claims under the NYSHRL, it does not address *Faragher/Ellerth* in this context.

"The NYSHRL allows for individual liability under two theories: [i] if the defendant has 'an ownership interest' in the employer or has 'the authority to hire and fire employees,' *Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (discussing N.Y. Exec. Law § 296(1)), [or] [ii] if the defendant aided and abetted the unlawful discriminatory acts of others, N.Y. Exec. Law § 296(6)." *E.E.O.C.* v. *Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014).[4]  An individual may be considered an "employer" if he or she has "an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'"  *Townsend* v. *Benjamin Enterprises, Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (quoting *Patrowich* v. *Chem. Bank*, 63 N.Y.2d 541, 543-44 (1984)).  However, as there is no evidence that Defendant Kelly had an ownership interest in Covidien or the authority to hire or fire employees, the Court will turn its focus to aiding and abetting liability.

"A supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that supervisor 'actually participates in the conduct giving rise to [the] discrimination.'"  *Feingold* v. *New York*, 366 F.3d 138, 157 (2d Cir. 2004) (quoting *Tomka*, 66 F.3d at 1317).  Indeed, "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim'" can be "held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  *Id.* at 158 (quoting *Tomka*, 66 F.3d at 1317); *see also Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10

---

[4]     *Tomka* was abrogated on other grounds by *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742 (1998).

(2d Cir. 2011) ("[W]hile an individual defendant with supervisory control may not be held personally liable under Title VII, an individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." (internal quotations and citations omitted)).

Despite — and perhaps because — of the *Tomka* decision, district courts in this Circuit have arrived at differing conclusions concerning certain nuances of aiding and abetting liability. Principal among these is a disagreement over whether an individual can be held liable for aiding and abetting *his own conduct* giving rise to a claim under Executive Law § 296(6). *Compare Tully-Boone* v. *North Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) ("The Court is mindful that the *Tomka* interpretation of § 296(6) is not without controversy. Nevertheless, 'until the Second Circuit revisits the issue, *Tomka* is the law in this circuit.' Accordingly, Backus may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability." (internal citations omitted)), *and Johnson* v. *County of Nassau*, 82 F. Supp. 3d 533, 536-37 (E.D.N.Y. 2015) ("Regardless of whether other employees contributed to the discrimination, under *Tomka*, a plaintiff may succeed in a claim under the NYSHRL by showing the employer entity's having encouraged, condoned, or approved the discriminatory conduct of a sole employee — the same discriminatory conduct which then, perhaps 'circular[ly],' proves individual liability under the aiding and abetting provision of Section

296(6)." (internal citations omitted)), *with Malanga* v. *NYU Langone Med. Ctr.*, No. 14 Civ. 9681 (WHP), 2015 WL 7019819, at *5 n.3 (S.D.N.Y. Nov. 12, 2015) (limiting *Tomka* to situations involving multiple individual defendants; "But '[a]s [Formenti's] alleged actions give rise to the discrimination claim [against NYU], [Formenti] cannot be held liable for aiding and abetting.'" (citations omitted)), *and Hicks* v. *IBM*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999) ("the primary actor cannot be an aider and abettor of his own actions").[5]

### b. Evaluating Claims for Employment Discrimination Under the NYSHRL

Courts in this Circuit analyze the merits of NYSHRL employment discrimination claims using the burden-shifting framework articulated in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802 (1973).  *See Spiegel* v. *Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010); *Bermudez* v. *City of New York*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011).  This test requires first that a plaintiff establish a *prima facie* case of discrimination by showing that: (i) he was part of a protected class; (ii) he was competent to perform the job in question or was

---

[5]    In part, this is because *Tomka*, while interpreting New York State law, has not been fully accepted by New York State courts.  *Compare Trovato* v. *Air Express Int'l*, 655 N.Y.S.2d 656, 657 (2d Dep't 1997) ("[t]o find a coemployee liable as an aider and abettor would ignore the statutory and legal authority limiting the parties who may be sued for employment discrimination"), *with Murphy* v. *ERA United Realty*, 674 N.Y.S.2d 415, 418 (2d Dep't 1998) ("Moreover, the broad language in [*Trovato*] should not be read to rule out a cause of action pursuant to Executive Law § 296(6) against a coemployee who is alleged to have actively aided and abetted the employer in acts prohibited under Executive Law article 15." (citing *Tomka*)), *and Steadman* v. *Sinclair*, 636 N.Y.S.2d 325, 326 (1st Dep't 1996) (finding individual aiding and abetting liability); *cf. Strauss* v. *New York State Dept. of Educ.*, 805 N.Y.S.2d 704, 709 (3d Dep't 2005) ("Where no violation of the Human Rights Law by another party has been established, we find that an individual employee cannot be held liable for aiding or abetting such a violation.  In other words, we hold that individuals cannot be held liable under Executive Law § 296(6) for aiding and abetting their own violations of the Human Rights Law." (citations omitted)).

performing his job duties satisfactorily; (iii) he suffered an adverse employment action; and (iv) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Spiegel*, 604 F.3d at 80; *accord Dawson* v. *Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005).

The plaintiff's burden in establishing a *prima facie* case is "*de minimis*." *Sassaman* v. *Gamache*, 566 F.3d 307, 311-12 (2d Cir. 2009).  The burden then shifts to the defendant to provide a legitimate, non-discriminatory basis for its action.  *Spiegel*, 604 F.3d at 80.  If the defendant produces evidence of a legitimate basis for its employment decision, then the burden returns to the plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *accord Spiegel*, 604 F.3d at 80.

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent."  *Holcomb* v. *Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (collecting cases).  Direct documentary evidence of an employer's discriminatory intent will rarely, if ever, be available; as such, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Gallo* v. *Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, if the evidence is "insufficient to permit a reasonable trier of fact to find that [ ] discrimination was the reason" for the adverse employment

18

action at issue, summary judgment is appropriate. *James* v. *N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

### 2.   Discussion

#### a.   Gorman Has Failed to Make Out a *Prima Facie* Case of Discrimination Based on His Status as a Veteran

Gorman plainly satisfies the first two requirements for a *prima facie* case of discrimination based on his veteran status:  He served in the military, placing him within the protected class of veterans, and his performance reviews at Covidien (as well as the fact that Covidien never directly removed Gorman from his position) indicate that he was sufficiently competent to do his job. Whether he meets the remaining requirements, however — that is, whether he suffered an "adverse employment action" under "circumstances giving rise to an inference of discrimination" — is another matter.  As detailed in the remainder of this section, the Court finds that Gorman has not established a *prima facie* case because none of his proffered theories of discrimination — including his placement on a PIP, his allegations of a constructive discharge, or the purported creation of a hostile work environment (*see* Pl. Opp. 10-13) — suffices.[6]  As such, the Court need not weigh in on the divisive issues of primary and accessorial liability under the NYSHRL that are discussed *supra*.

---

[6]     Although incidents may be considered in the aggregate in the retaliation context, *see Hicks* v. *Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("[I]n determining whether conduct amounts to an adverse employment action [under Title VII], the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."), it is less clear that courts may aggregate incidents in the discrimination context, *see Kaur* v. *New York City Health & Hosp. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("[T]here is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiffs'

An "adverse employment action" requires that, as a consequence, an employee experience a "materially adverse" change in the terms of his employment:

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*E.E.O.C.* v. *Bloomberg L.P.*, 967 F. Supp. 2d 816, 843 (S.D.N.Y. 2013) (quoting *Sanders* v. *N.Y.C. Human Resources Administration*, 361 F.3d 749, 755 (2d Cir. 2004)); *see also Brown* v. *Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (summary order) (finding an employee's placement on an employment improvement plan insufficient to constitute an adverse employment action).

The PIP on which Gorman was placed is not "materially adverse" within the meaning of the NYSHRL. It had no automatic material effect on the conditions of Gorman's employment, with the exception of a temporary ineligibility for salary increases during its 90-day duration; rather, the PIP clarified the expectations for Gorman's position, providing four "Performance Objectives," in accordance with which Gorman would be expected to improve specific behaviors. (*See* Aranyos Decl. Ex. BB). A comparison of the Territory Manager job description to the Performance Objectives set forth in the PIP

---

discrimination claim."). For purposes of this Opinion, the Court will consider Gorman's claims of discrimination individually and aggregated.

indicates that the PIP effected no substantial change to Gorman's responsibilities, but merely provided a more detailed framework within which he was to perform his work. (*Compare id.*, *with* Aranyos Decl. Ex. T). In short, though Gorman might have less flexibility and more supervision, the fundamental contours of his job remained the same.

Granted, the increased structure would likely be inconvenient and perhaps onerous: Gorman would have to keep strict records of his activities, plan out the use of his time one week in advance, and participate in weekly conference calls with supervisors. (*See* Aranyos Decl. Ex. BB). However, this manner of change amounts to precisely the sort of "inconvenience" or "alteration of job responsibilities" that fails to suffice as a materially adverse employment action.

Finally, while it is the case that Gorman could be terminated for failing to abide by the PIP, that potentiality does not transform the PIP itself into a materially adverse employment action. (*See* Pl. Opp. 10). In the event that Gorman successfully completed the PIP (as he had successfully overcome the Final Written Warning and completed the Coaching Plan in the past), he would remain in his position. Absent some indication that the PIP was an unachievable pretext to facilitate Gorman's termination at the end of its duration (a scenario for which Gorman has produced no evidence), the mere fact that failure to abide by its terms could lead to termination does not transform the PIP into a materially adverse employment action. *See also McGrath* v. *Thomson Reuters*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2119112,

21

at *11 (S.D.N.Y. Apr. 30, 2012) (collecting cases for the proposition that "[t]he issuance of a performance improvement plan to an employee is simply not an adverse employment action"), *report and recommendation adopted*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd,* 537 F. App'x 1 (2d Cir. 2013) (summary order).

Gorman further suggests that he was subject to a materially adverse employment action in the form of a constructive discharge from Covidien. (Pl. Opp. 12-13). The Court disagrees. A constructive discharge occurs when an employer, rather than discharging its employee directly, "intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Terry* v. *Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003). The Second Circuit has emphasized that

> a constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant.

*Spence* v. *Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993). Finally, "[a]n employee who fails to explore alternative avenues offered by [his] employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." *Simmons-Grant* v. *Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013) (quoting *Cooper* v. *Wyeth Ayerst Lederle,* 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000)).

Gorman argues that his placement on a PIP, paired with the $240,000 credit that was levied against his commissions and his loss of a lucrative sale opportunity, constituted constructive discharge.  (Pl. Opp. 13).[7]  Significantly, however, constructive discharge requires a showing that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Pena* v. *Battleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983).  Here, by contrast, the PIP created a roadmap for Gorman to succeed in his position, with ongoing guidance and support from Gorman's supervisors.  As an at-will employee, Gorman had the freedom to choose resignation over completion of PIP, and he was within his rights to opt for alternative employment.  Nothing about the PIP, however, indicates that resignation was Gorman's only reasonable option; this is particularly so given his successful completion of an analogous Coaching Plan in the past.  (*See* Def. 56.1 ¶¶ 24, 33).

Likewise, neither the credit levied against Gorman's commissions nor his removal from the Stony Brook account constitutes, separately or in the aggregate, a constructive discharge.  While a change in title or a deduction in salary may in some cases support a claim for constructive discharge, *see, e.g., Scott* v. *Harris Interactive, Inc.* 512 F. App'x 25, 28 (2d Cir. 2013) (summary

---

[7]     Gorman asserts his loss of Catholic Health Services ("CHS") sales as a predicate event for his constructive discharge claim.  (Pl. Opp. 13).  However, the record contains no mention of Gorman having ever been removed from the CHS group of accounts; the only account from which Gorman appears to have been removed was Stony Brook.  As such, the Court assumes that Gorman intends to refer to his removal from the Stony Brook account.  Insofar as Gorman intends to refer to his loss of business with the broader group of CHS accounts, he has provided no evidence to indicate that such loss occurred.

order), it cannot on these facts.  The levy against Gorman's commissions was a one-time occurrence stemming from a customer's decision to cash in "reward credits" it had earned; it was unrelated either to Gorman's performance or to any direct decision by Covidien.  (*See* Gorman Dep. 315-17).  Furthermore, the levy affected not only Gorman's commissions, but also those of Mullen and Kelly, albeit not to the same degree.  (*Id.* at 317-18).  And Gorman's removal from the Stony Brook account occurred at the customer's request, due to its dissatisfaction with Gorman; once again, the action involved no independent consideration by Covidien and certainly cannot be viewed as an attempt to coerce Gorman's resignation.  (*See id.* at 155 (stating that the customer requested Gorman's removal from the Stony Brook account)).[8]

Alternatively, Gorman argues that he was subject to a hostile work environment in violation of the NYSHRL.  (Pl. Opp. 11-12).  This, too, fails. Such a theory requires Gorman to show that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive

---

[8]     Gorman does allege that his removal from the Stony Brook account occurred as a direct result of Kelly's actions:  He states in his Complaint that "[o]n or about May 14, 2013, Defendant Kelly instructed [Gorman] to breach [Stony Brook's] hospital policy, which resulted in [Gorman's loss of the account]."  (Compl. ¶ 27).  However, even crediting this account of events — for which there is scant, if any, record support — Gorman has provided no evidence to suggest that any such instructions stemmed from Kelly's alleged discriminatory animus.  Furthermore, Gorman had a confrontation with Moscarelli about Gorman's failure to abide by hospital policy "in February or March," which, even if it came about through some fault of Kelly's, was indisputably prior to Kelly's learning of Gorman's status as a disabled veteran.  (Gorman Dep. 149-52). Finally, the circumstances of Gorman's removal from the Stony Brook account carry no inference of discrimination given that Covidien permitted Gorman to receive commissions on the Stony Brook account even after his removal.  (*See* Gorman Dep. 267 (affirming that Gorman "suffered no financial loss" as a result of his removal from the Stony Brook account)).

working environment." *Lenart* v. *Coach Inc.*, No. 15 Civ. 1922 (JMF), 2015 WL
5319735, at *3 (S.D.N.Y. Sept. 11, 2015) (quoting *Redd* v. *N.Y. Div. of Parole,*
678 F.3d 166, 175 (2d Cir. 2012)).  In this regard, a court must "distinguish
between merely offensive or boorish conduct and conduct that is sufficiently
severe or pervasive as to alter the conditions of employment," *O'Dell* v. *Trans
World Entm't Corp.*, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001) (internal
quotation marks omitted), considering "the frequency of the discriminatory
conduct; its severity; whether it is physically threatening or humiliating, or a
mere offensive utterance; and whether it unreasonably interferes with an
employee's work performance," *id.* (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S.
17, 23 (1993)).

Gorman supports his claim of a hostile work environment by pointing to
anti-veteran statements allegedly made by Kelly; Kelly's aggressive manner of
addressing Gorman when presenting Gorman with the PIP; and the purportedly
hostile manner in which Mullen conducted the weekly PIP telephone
conferences with Gorman.  (Pl. Opp. 12).  Considering first the conduct
attributed to Kelly, the Court concludes that, even construing the record in the
light most favorable to Gorman, these actions fail to rise to the level of a hostile
work environment claim.  *See, e.g.*, *Lenart*, 2015 WL 5319735, at *5 (finding, in
context of motion to dismiss, that allegations of hostile comments made on
"numerous occasions" were isolated acts that failed to meet the requisite
threshold for severity or pervasiveness required for a hostile work environment
claim (quoting *Alfano* v. *Costello,* 294 F.3d 365, 373-74 (2d Cir. 2002)).

Gorman further alleges that Kelly referred to him as the "Cable Guy" during a telephone call.  (Pl. Opp. 12).  The significance of this sobriquet is neither explained by Gorman nor apparent to the Court; in any event, it constitutes no more than another isolated act that, either independently or aggregated with Kelly's other behavior, fails to support a hostile work environment claim.

Finally, Gorman alleges that Mullen "suggested Gorman should be terminated and became consistently argumentative and confrontational" with Gorman during their weekly calls.  (Pl. Opp. 12).  As with Kelly's comments, Mullen's isolated suggestion fails to rise to the level of a hostile work environment.  Furthermore, Gorman's characterization of the conference calls is belied by the very recordings of those calls that Gorman himself submitted and that the Court has reviewed.  (*See* Wash. Decl. Ex. 2).  While the communications are sometimes tense, Mullen's demeanor can best be described as intermittently frustrated; he certainly does not conduct the calls in such an abusive or hostile manner as to support Gorman's assertion of a hostile working environment.  (*See id.*).

Accordingly, because Gorman has failed to make out a *prima facie* case of military status discrimination under the NYSHRL, the Court grants Defendants' summary judgment motion on that claim.

> **b.    Gorman Has Failed to Make Out a *Prima Facie* Case of Discrimination Based on a Disability**

As noted, Gorman brought a second claim for discrimination under the NYSHRL for disability discrimination.  The burden-shifting remains the same, but the merits of the claim are analyzed through the prism of the Americans

with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117 (the "ADA").  *See Graves* v. *Finch Pruyn & Co., Inc.,* 457 F.3d 181, 184 n.3 (2d Cir. 2006) (explaining that the same legal standards govern NYSHRL claims as govern ADA claims); *see also Gingold* v. *Bon Secours Charity Health Sys.,* 768 F. Supp. 2d 537, 543 n.6 (S.D.N.Y. 2011) (where the Court determines that a plaintiff has a disability under the ADA, that plaintiff's NYSHRL claim "'survives or fails on the same basis' as his ADA claim" (citation omitted)).  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: "[i] his employer is subject to the ADA; [ii] he was disabled within the meaning of the ADA; [iii] he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and [iv] he suffered adverse employment action because of his disability." *McMillan* v. *City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (citation omitted).

As with his claim of discrimination based on his veteran status, Gorman has failed to establish a *prima facie* case of discrimination based on disability under the NYSHRL.  A plaintiff suffers an "adverse employment action" under the ADA when "he or she endures a 'materially adverse change' in the terms and conditions of employment."  *Galabya* v. *New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citing *Richardson* v. *N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)); *see also Davis* v. *N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235-36 (2d Cir. 2015).  A "materially adverse change," in turn, is a change in working conditions that is "more disruptive than a mere

27

inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (citations omitted). In the ADA context, "[e]xamples of materially adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities[.]'" *Feingold*, 366 F.3d at 152 (quoting *Galabya*, 202 F.3d at 640).

The employment conditions identified by Gorman, including in particular his placement on a PIP, are insufficient, individually or in the aggregate, to constitute a materially adverse employment action. *See Chang* v. *Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (summary order) ("[O]ral and written warnings do not amount to materially adverse conduct in light of our reasoning in *Joseph* v. *Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006), in which we stated that '[t]he application of the [employer's] disciplinary policies to [the employee], without more, does not constitute adverse employment action.'"); *Parinello* v. *Bausch & Lomb*, No. 10 Civ. 6519 (MAT), 2013 WL 1680152, at *8-9 (W.D.N.Y. Apr. 17, 2013) (concluding that verbal warnings, placement on PIP, reduction in work load, and being ostracized at work did not constitute adverse employment actions for ADA claim); *McGrath*, 2012 WL 2119112, at *11 (recommending rejection of argument under ADA that issuance of a performance improvement plan amounts to a qualifying employment action; collecting cases). Accordingly, summary judgment is granted with respect to both of Gorman's discrimination claims under the NYSHRL.

28

**C.      Summary Judgment Is Denied as to Gorman's Discrimination Claim Under the NYCHRL**

**1.      Applicable Law**

The NYCHRL proscribes, among other things, "discriminat[ion] against [a] person in compensation or in terms, conditions or privileges of employment," because of that person's disability.  N.Y.C. Admin. Code § 8-107(1)(a).[9]  Unlike Title VII, which does not extend to individual employees, or the NYSHRL, which covers only limited classes of employees, the NYCHRL expressly creates direct liability for employment discrimination against "an employee or agent" of the employer in question.  N.Y.C. Admin. Code § 8-107(1)(a).

The NYCHRL also specifies a broader standard for the imputation of employee conduct to an employer:  Specifically, employer liability under the NYCHRL can arise in three circumstances:

> [i] where the offending employee "exercised managerial or supervisory responsibility" … [ii] where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take "immediate and appropriate corrective action"; and [iii] where the employer "should have known" of the offending employee's unlawful discriminatory conduct yet "failed to exercise reasonable diligence to prevent it."

*Zakrzewska* v. *New School*, 14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)); *see also Garrigan* v. *Ruby Tuesday, Inc.*, No. 14 Civ. 155

---

[9]      The NYCHRL does not specifically list veterans as a protected group.  *See* N.Y.C. Admin. Code § 8-107(1)(a).  However, because Gorman has not alleged military status discrimination under the NYCHRL, the Court does not consider whether the expansive interpretation of the NYCHRL set forth by the Second Circuit would fairly place claims of veteran discrimination within the ambit of that law.  *See Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), discussed in the text.

(LGS), 2014 WL 2134613, at *6 (S.D.N.Y. May 22, 2014) ("The NYCHRL

imposes strict liability on employers for discriminatory acts of managerial

employees." (citations omitted)).  The New York Court of Appeals has further

clarified that an employer may not invoke the *Faragher/Ellerth* defense with

respect to a claim under the NYCHRL.

> [T[he plain language of the NYCHRL precludes the
> *Faragher-Ellerth* defense. In many ways, the NYCHRL
> parallels state law prohibiting discrimination by
> employers (compare Administrative Code of City of N.Y.
> § 8-107[1][a], [b] and Executive Law § 296).  Unlike state
> law, though, subdivision (13) of section 8-107 of the
> NYCHRL creates an interrelated set of provisions to
> govern an employer's liability for an employee's
> unlawful discriminatory conduct in the workplace. This
> legislative scheme simply does not match up with the
> *Faragher-Ellerth* defense

*Zakrzewska*, 14 N.Y.3d at 479; *cf. id.* at 480 (observing that "an employer's

antidiscrimination policies and procedures — which are at the heart of the

*Faragher-Ellerth* defense — shield against liability, rather than merely diminish

otherwise potentially recoverable civil penalties and punitive damages, only

where an employer should have known of a non-supervisory employee's

unlawful discriminatory acts").

 Finally, the merits of claims under the NYCHRL are assessed differently

from claims under Title VII or the NYSHRL.  While the general framework set

forth in *McDonnell Douglas* still applies, the Second Circuit has noted that

district courts "must analyze NYCHRL claims separately and independently

from any federal and state law claims" and "constru[e] the NYCHRL's provisions

broadly in favor of discrimination plaintiffs, to the extent that such a

construction is reasonably possible." *Mihalik* v. *Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  The precise extent to which the assessment of NYCHRL claims differs from that of claims under other antidiscrimination statutes has produced some confusion; however,

> what remains clear is that the NYCHRL has "simplified the discrimination inquiry: the plaintiff need only show that [his] employer treated [him] less well than other similarly situated employees, at least in part for discriminatory reasons. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record established as a matter of law that discrimination played *no* role in its actions."

*Bloomberg L.P.*, 967 F. Supp. 2d at 836 (quoting *Mihalik*, 715 F.3d at 110 n.8) (emphasis in original); *accord Ya-Chen Chen* v. *City Univ. of New York*, — F.3d —, No. 14 Civ. 1469, 2015 WL 6499909, at *13 (2d Cir. Oct. 28, 2015).

## 2. Discussion

### a. Gorman Has Established That He Suffered an Adverse Action Within the Meaning of the NYCHRL

Unlike the NYSHRL, the NYCHRL does not require that an employment action taken against a plaintiff be "materially adverse" in order for the plaintiff to establish a *prima facie* case of discrimination.  *See Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009) (holding there is no material adversity requirement for a claim under the NYCHRL); *accord Varughese* v. *Mount Sinai Med. Ctr.*, No. 12 Civ. 8812 (CM) (JCF), 2015 WL 1499618, at *39 (S.D.N.Y. Mar. 27, 2015); *Williams* v. *Regus Mgmt. Group, LLC*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011).  Rather, "[i]n order to make out the [adverse action]

prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that [he] was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Id.* Additionally, "[u]nder the NYCHRL, 'the [final prong] of the *prima facie* case is satisfied if a member of a protected class was treated differently than a worker who was not a member of that protected class.'" *Kellman* v. *Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 380 (S.D.N.Y. 2014) (quoting *Leon* v. *Columbia Univ. Med. Ctr.*, No. 11 Civ. 8559 (NSR), 2013 WL 6669415, at *11 (S.D.N.Y. Dec. 17, 2013)).

In the present case, while Gorman's placement on a PIP does not rise to the requisite level of severity for an adverse employment action under the NYSHRL, it does suffice to meet the lower threshold of the NYCHRL. A PIP is not something imposed upon every employee (Wash Decl. Ex. 6 at 4), and thus constitutes a difference between Covidien's treatment of Gorman and of employees not perceived as disabled. The PIP, though not unreasonable, did impose additional strictures on Gorman that could be fairly characterized as "more than trivial, insubstantial, or petty," and also excluded him from salary increases during the plan's three-month duration. (*See id.* at 7; Aranyos Decl. Ex. BB). Because Gorman has identified the existence of an adverse action within the meaning of the NYCHRL, the Court must then consider whether Gorman was disabled within the meaning of the NYCHRL, and if so, whether his disabled status was causally related to that adverse action.

32

> ### b.  Gorman Has Raised an Issue of Fact Regarding His Disabled Status and Its Connection to the Employment Action Taken Against Him

Defendants argue that the decision to place Gorman on a PIP could not have been based on Gorman's alleged disability, his PTSD, because at the time of the action Defendants were unaware of Gorman's disability: Gorman had not yet been formally diagnosed with PTSD, and was thus himself unaware of any disability.  (Def. 56.1 ¶¶ 95-96).  However, the ADA defines "disability" as "[i] a physical or mental impairment that substantially limits one or more major life activities of such individual; [ii] a record of such impairment; or [iii] *being regarded as having such an impairment*[.]" 42 U.S.C. § 12102(1) (emphasis added).  It is the third definition that is implicated here.

Prior to the ADA Amendments Act of 2008 (the "ADAAA"), a plaintiff alleging that he was "regarded as" disabled by his employer had to demonstrate that his disability "substantially limited a major life activity."  *Davis* v. *New York City Dep't of Educ.*, No. 10 Civ. 3812 (KAM) (LB), 2012 WL 139255, at *5 (E.D.N.Y. Jan. 18, 2012) (citation omitted).  The ADAAA, however, sets forth a broader definition of what constitutes being "regarded as" disabled:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

*Id.* (quoting 42 U.S.C. § 12102(3)(A)).  Consequently, Gorman need not have been formally diagnosed with PTSD at the time of the adverse employment

action, so long as Kelly *perceived* Gorman as suffering from a limiting mental impairment.

Gorman has raised a material issue of fact regarding Kelly's perception of him as disabled.  According to Gorman, when he and Kelly spoke on May 13, 2013, Kelly stated that "soldiers that suffer from posttraumatic stress disorders are babies, who … can't handle the normal stresses of life." (Gorman Dep. 183).  Gorman reports that he subsequently told Kelly that he himself had "been out in the Middle East," and that "when [he] came back from [his] two trips, [he] had gone through some problems as a result of it." (*Id.* at 185). Then, on June 7, 2013, Kelly is alleged to have told Gorman that he expected "military people to be much more competent and organized than you are, but, I guess, babies, you know, like you, need a little bit more direction." (*Id.* at 214). Given Kelly's previous alleged comment in which he identified veterans who have difficulty adjusting to civilian life as "babies" who were impaired in dealing with normal stress; Gorman's identification of himself as a veteran who had difficulty adjusting once he returned home; and Kelly's subsequent characterization of Gorman as a "baby" who needed extra guidance in doing his job, Gorman has raised a triable issue of fact regarding whether Kelly perceived him as having a mental impairment so as to satisfy that prong of a *prima facie* case for disability discrimination.  Furthermore, the timing and substance of the statements — particularly the connection Kelly draws between "babies" with PTSD and "babies" who need additional guidance, such as a PIP, to perform their jobs — prevent the Court from saying, as a matter of law, that no

connection exists between Kelly's alleged perception of Gorman as disabled and Kelly's subsequent involvement in precipitating and implementing the PIP.

Hence Gorman has made a threshold showing for discrimination under the NYCHRL, albeit by the slimmest of margins.  And inasmuch as Kelly was Gorman's direct supervisor, his conduct is imputed to Covidien under § 8-107(13).  The Court must now consider Defendants' proffered justifications for their actions, and Gorman's evidence that discriminatory animus nevertheless played at least some motivating role.

### c. Gorman Has Raised an Issue of Fact Concerning Whether Discrimination Played a Motivating Role in Defendants' Employment Actions

A plaintiff claiming that his employer acted with a combination of both discriminatory and legitimate motives when taking an adverse employment action must, under the NYSHRL, "produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."  *Sista* v. *CDC Ixis N. Am.*, Inc., 445 F.3d 161, 174 (2d Cir. 2006) (internal citation omitted).  By contrast, under the NYCHRL, the burden is on the defendant to show that discrimination played *no* role in the employment action at issue.  *Ya-Chen Chen*, 2015 WL 6499909, at *13; *see also Varughese*, 2015 WL 1499618, at *40.

Nevertheless, courts have repeatedly noted that "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56."  *Lytle* v. *JPMorgan Chase*, No. 08 Civ. 9503 (DAB) (JLC), 2012 WL 393008, at *19 (S.D.N.Y. Feb.8,

2012) (quoting *Williams*, 2011 WL 6073560, at *6 (quotation marks and citations omitted)), *report and recommendation adopted sub nom. Lytle* v. *JP Morgan Chase*, No. 08 Civ. 9503 (DAB), 2012 WL 1079964 (S.D.N.Y. Mar. 30, 2012), *aff'd*, 518 F. App'x 49 (2d Cir. 2013) (summary order); *accord Varughese*, 2015 WL 1499618, at *40; *Arnow* v. *Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 486 (S.D.N.Y. 2013); *Campbell* v. *Cellco P'ship*, 860 F. Supp. 2d 284, 294 (S.D.N.Y. 2012).  In other words, courts must remain "mindful that the NYCHRL is not a 'general civility code.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 40-41).  "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.  [He] must show that [he] has been treated less well at least in part *because of* [his protected status]."  *Id.* (internal quotation marks omitted).

Defendants have countered Gorman's *prima facie* case of discrimination by showing that Covidien had legitimate, nondiscriminatory reasons for placing Gorman on the PIP, including concern that Gorman had not developed meaningful relationships with his clients; insufficient sales opportunities reflected in Gorman's sales account; Gorman's failure to communicate effectively with his sales team and key physician-clients; and unprofessional behavior.  (Aranyos Decl. Ex. BB).  Prior to Gorman's placement on the PIP, multiple individuals inside and outside Covidien had voiced concerns about his behavior and performance.  (*See* Aranyos Decl. Ex. V (email from Megan Desmond to Dale Kelly); Aranyos Decl. Ex. AA (email from Kendall Qualls to

Dale Kelly); Gorman Dep. 153-54 (stating that Gorman knew a customer had complained about him to Kelly)).  Furthermore, it is undisputed that several of the individuals either directly or indirectly responsible for placing Gorman on the PIP had no apparent prejudice against him based on his veteran status — in fact, both Kendall Qualls and George Mullen are themselves veterans. (Gorman Dep. 170 (stating that Qualls was a veteran), 206 (stating that Mullen was a veteran); *see also id.* at 156 (stating that Gorman had a good working relationship with Desmond and no reason to believe she was biased against him)).

However, while Defendants have provided legitimate reasons for their actions, they have failed to exclude the possibility that discrimination against Gorman based on his disabled status played some role in the decision to place him on the PIP.  Gorman's supervisor, Dale Kelly, was the impetus behind Gorman's placement on the PIP; while Kelly may have lacked the authority unilaterally to place Gorman on a PIP, he was clearly an influential player in the company's decision.  (Mullen Dep. 86 (stating that the PIP was "initially motivated from Dale Kelly's concerns," and that it was then a "collaborative discussion" between Kelly, Mullen, and Covidien's Human Resources Department); Def. 56.1 ¶ 68)).  And while a reasonable juror could certainly find that Kelly's actions were not based on any discriminatory animus, Gorman has raised a factual question regarding Kelly's motivation sufficient to survive summary judgment.

Defendants argue that even if Kelly's allegedly discriminatory motives can be used to find liability against Covidien, Covidien has purged itself of the blight of discriminatory animus by conducting an internal investigation into Gorman's discrimination complaint and removing Kelly from the oversight of the PIP.  (Def. Br. 18-19; Def. Reply 7-8).  However, this variant of the *Faragher/Ellerth* defense is foreclosed by *Zakrzewska*.  In short, because Kelly's recommendations played an integral role in Gorman's placement on the PIP, Kelly is liable individually under the NYCHRL for any actions taken with discriminatory animus — an issue that cannot be decided as a matter of law in this motion — and Covidien may be held liable for any discriminatory employment actions taken by Kelly as Gorman's supervisor.  *See* N.Y.C. Admin. Code § 8-107(13) ("An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee ... where: [] [t]he employee or agent exercised managerial or supervisory responsibility").  Consequently, Gorman's claim for disability discrimination against both Covidien and Kelly under the NYCHRL survives summary judgment.

**D.    Summary Judgment Is Granted as to Gorman's Claims for Retaliation Under the NYSHRL and the NYCHRL**

**1.    Applicable Law**

In addition to creating liability for direct discrimination, the NYSHRL makes it unlawful for any person to retaliate against someone who has opposed or filed a complaint of discrimination.  N.Y. Exec. Law § 296(7).  The NYCHRL similarly prohibits retaliation for activity protected under that law.  N.Y.C. Admin. Code. § 8-107(7).

"The standard[] for evaluating...[a] retaliation claim[] is identical under Title VII and the NYSHRL." *Kelly* v. *Howard I. Shapiro & Assoc. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006). This is a broader standard than the "adverse employment action" standard discussed previously. *Millea* v. *Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011) (noting that *Burlington* expanded the definition of "materially adverse employment action" for purposes of Title VII retaliation).

As the Supreme Court made clear in *Burlington*, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67. By contrast, "[a]ctions that are 'trivial harms' — i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' — are not materially adverse." *Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68). As the Second Circuit explained:

> Material adversity is to be determined objectively, based on the reactions of a reasonable employee. "Context matters," as some actions take on more or less significance depending on the context. Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.

*Id.* (quoting *Burlington*, 548 U.S. at 68).

The NYCHRL is even broader:  It prohibits an employer from engaging in any activity "reasonably likely to deter a person from engaging in [protected] action."  *Mihalik,* 715 F.3d at 112; *see also* N.Y.C. Admin. Code § 8-107(7).  The Second Circuit has instructed, however, that "the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by … retaliatory motives, of if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'"  *Id.* at 113 (quoting *Williams*, 872 N.Y.S.2d at 41).

### 2.    Discussion

Gorman's claims fail under either statute.  In order for an employment action to be retaliatory, it must occur after the protected activity for which an employee is being retaliated against.  Here, Gorman alleges that Defendants retaliated against him for the internal complaints he made against Dale Kelly. (Compl. 9-12; Pl. Opp. 17-18).  However, Gorman received the PIP prior to his complaints (Def. 56.1 ¶ 78), making it impossible for the PIP to serve as retaliation for his entering of the complaints.

Gorman adds that his required weekly check-in calls became increasingly hostile and were designed to "demoraliz[e], demea[n] and humilat[e]" him (Compl. ¶¶ 71, 84) — presumably in retaliation for his complaint — but the record belies this contention.  The recordings of the calls submitted by Gorman demonstrate unremarkable, if sometimes tense and frustrated, conferences between a supervisor and employee.  (Wash Decl. Ex. 2).  Furthermore, after Gorman reported his concerns about Kelly, Mullen

took over Kelly's duties in overseeing Gorman's PIP; such a response to Gorman's complaint hardly appears "reasonably likely to deter a person from engaging in [protected] action."

The only other employment actions Gorman points to as a basis for his retaliation claim are the $240,000 levy against his commissions and his removal from the "Catholic Health Services" account.  (Pl. Opp. 18).  Regarding the former, as discussed *supra*, the levy against Gorman's commissions was not an independent decision made by Covidien, but rather a client decision to capitalize on credits it had accrued.  (Gorman Dep. 258-59).  As such, no reasonable juror could find a causal connection between the levy and Gorman's protected activity.  As for Gorman's removal from the Catholic Health Services account, such an event is reflected nowhere in the record.  *See* n.7, *supra*.  The only account from which Gorman has shown he was removed was the Stony Brook account, and his loss of that account fails to serve as a basis for his retaliation claim for multiple reasons:  It came about following a direct request from the customer that Gorman be removed (*id.* at 153-54); Gorman continued to receive commissions on the account after his removal (*id.* at 267); and, again, the action occurred prior to any protected activity by Gorman (*see, e.g.*, *id.* at 199 (stating that Gorman had been "kicked off" the Stony Brook account as of May 31, 2013); Aranyos Decl. Ex. W (email from Kelly referring to Gorman's removal from Stony Brook, dated May 17, 2013); Def. 56.1 ¶ 78 (stating that Gorman's internal complaint call was placed on June 11, 2013)).

Because Gorman has failed to raise a material issue of fact regarding the occurrence of any retaliatory action by Defendants under either the NYSHRL or the NYCHRL, summary judgment is granted for the Defendants on both claims.

### E.   Summary Judgment Is Granted as to Gorman's Claim for Intentional Infliction of Emotional Distress

Gorman's final claim is for intentional infliction of emotional distress (or "IIED") under New York law.  To maintain such a claim, a plaintiff must establish "[i] extreme and outrageous conduct, [ii] intent to cause severe emotional distress, [iii] a causal connection between the conduct and the injury, and [iv] severe emotional distress."  *Sylvester* v. *City of New York*, 385 F. Supp. 2d 431, 441 (S.D.N.Y. 2005) (quoting *Bender* v. *City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).  In New York, liability under an IIED theory "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schoolcraft* v. *City of New York*, No. 10 Civ. 6005 (RWS), 2015 WL 5542770, at *5 (S.D.N.Y. Sept. 18, 2015) (quoting *Howell* v. *New York Post Co.*, 81 N.Y.2d 115, 122 (1993)); *accord Turley* v. *ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014); *Tagliaferri* v. *Szulik*, No. 15 Civ. 2685 (LGS), 2015 WL 5918204, at *2 (S.D.N.Y. Oct. 9, 2015).  "[A]lthough providing relief for plaintiffs upon occasion," IIED "remains a highly disfavored tort under New York law."  *Turley*, 774 F.3d at 158 (internal quotation marks and alteration omitted) (collecting cases).

In the present case, neither Defendant's actions satisfy the high bar for outrageousness set by New York law.  Kelly's alleged statements regarding military personnel and his hostile demeanor when presenting Gorman with the PIP, if true, may well have been insulting.  However, they do not rise to the level of "utterly intolerable in a civilized community."  Insults, bullying, and general harassment do not usually constitute a claim for IIED under New York law, and they certainly do not upon the facts alleged here.

Looking to Covidien, Gorman has not specified a factual basis for his IIED claim against his employer, except presumably via *respondeat superior* liability for Kelly's behavior.  (*See* Compl. ¶¶ 87-90; Pl. Opp. 19-20).  Gorman does argue that Covidien failed to investigate adequately his discrimination claims, but this allegedly insufficient investigation fails to support an IIED claim on both a legal and factual level:  The failure to respond appropriately to complaints of harassment will serve as the basis for an IIED claim only in the most egregious of cases.  *See Turley*, 774 F.3d at 161 (collecting cases). Furthermore, the record in this case shows that Covidien promptly conducted an investigation into Gorman's claims, interviewed the various parties involved, and removed Kelly from the oversight of Gorman's PIP.  (*See* Aranyos Decl. Ex. CC and DD; Def. 56.1 ¶ 93).  Such a response might be insufficient in some scenarios; but on this record, it most certainly does not constitute inaction "so beyond the pale as to reach the extreme threshold necessary for an IIED claim."  *Id.*  Defendants' motion for summary judgment on Gorman's IIED claims is therefore granted.

## CONCLUSION

For the reasons discussed in this Opinion — in particular, the breadth of conduct covered by the NYCHRL and the procedural posture in which this motion arises — Defendants' motion for summary judgment is GRANTED in part and DENIED in part:  Summary judgment is granted in favor of Defendants on Gorman's claims for discrimination and retaliation under the New York State Human Rights Law, retaliation under the New York City Human Rights Law, and for intentional infliction of emotion distress. Gorman's claim against Defendants for disability discrimination under the New York City Human Rights Law remains.  The Clerk of Court is directed to terminate the motion at Docket Entry 28.  The Court emphasizes that Gorman has eluded summary judgment by a narrow margin, and that a jury will not be obliged to exercise the same solicitude for his claims.

The parties are to appear for a pretrial conference on **December 16, 2015** at **3:30 p.m.**, in Courtroom 618 of the Thurgood Marshall Courthouse, in order to discuss next steps in this case.

SO ORDERED.

Dated:      November 19, 2015
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge